UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

UNITED STATES OF AMERICA,                    CASE NO.: 00-6119-CR-ZLOCH

    Plaintiff,

vs.

GREGORY PILLOCK, LAWRENCE
LONDON, WILLIAM MOCCIA, TERRILL
MYERS, ERIK JOHNSON, ROD STIDHAM,
and JOHN MINIX,

    Defendants.
_____/



## OBJECTIONS TO THE PRESENTENCE INVESTIGATION REPORT

COMES NOW the Defendant, GREGORY PILLOCK, by and through his undersigned counsel and hereby files this his Objections to the Presentence Investigation Report, and states unto the Court as follows:

1. The Defendant objects to the probation officer's role assessment in paragraph 36 of the report alleging that Pillock acted as a leader, organizer of a criminal activity involving five or more participants.

2. In support of this objection, the Defendant has attached as Exhibit "A" a statement given by the Defendant on the day of his arrest to Broward County Sheriff's Deputy Andy Weinman. It was co-defendant Lawrence London who orchestrated the offense by instructing Pillock to call the source of the marijuana in Jamaica known as "Willow". See statement of Gregory Pillock at 6.

3. Using Pillock as a middleman, London instructed that Willow call concerning the rental of the airplane used in the offense and to make other arrangements associated with that effort. Id.

4.     At London's instruction, Willow contacted Tar Heel Aviation in North Carolina. Id. at 7.

5.     Pillock did play a role however in arranging for the boat used in this illegal operation by securing people to man on the boat, specifically, Eric Johnson and Terrill Myers. Id. at 8.

6.     However, it was Larry London who recruited William Moccia, John Minnix and Rod Stidham to assist in the operation. In fact, London exercised veto power over the choice of boat, captain and crew used in the operation. It was London who insisted that Rod Stidham be a crew member on the boat. London also demanded $30,000 from the Jamaican supplying the marijuana prior to commencing the operation. Id. at 29-30..

7.     Pillock was without any knowledge as to how the money was transferred between Jamaica and the United States in order to purchase the marijuana. Id. at 30.

8.     In contrast, Pillock received only $7,000 in advance for this operation. Id. at 31.

9.     Additionally, when a quantity of the marijuana was lost at sea, it was London who made threatening demands to take what was supposed to be his full share from the entire load by force if necessary, along with Johnny Minnix. Id. at 22-23.

10.     As a result, London received 350 pounds of marijuana as his share in addition to $30,000 that he had been previously advanced by the Jamaicans. It was Larry London who orchestrated a dry run operation and chose the coordinates. The Defendant submits that these facts indicate that he was lesser of an organizer than co-defendant London and as a result should only receive a 2 level aggravating role adjustment as opposed to a 4 level aggravating role adjustment as contained in the presentence

investigation report at paragraph 36.

11.    The Defendant also objects to the facts alleged surrounding an arrest for assault with a dangerous weapon as indicated at paragraph 62 of the presentence investigation report.[1] While the offense did involve a physical altercation stemming from a financial dispute, the altercation was not as one sided as the witness' statement, referred to by the probation officer, would indicate. In fact, the alleged victim, who is much bigger than Pillock, consensually engaged in a fist fight with Pillock but when the alleged victim began to get the best of Pillock, Pillock armed himself with a stick to repel the alleged victim. The Defendant was not seeking to cause any permanent serious bodily injury but merely to defend himself. The Defendant denies that he tried to stuff paperwork regarding the financial dispute down the alleged victim's throat.

12.    The Defendant also objects to the factual allegations contained in paragraph 65 of the report with regard to an arrest and subsequent nolle prosequi for aggravated battery on a pregnant woman. While the Defendant admits that he was involved in a verbal confrontation with Shan Wilson, the Defendant's girlfriend to date, it was Ms. Wilson who resorted to physical violence first by slapping Mr. Pillock in the face. While Pillock admits that he pulled Ms. Wilson's hair and, is regretful for doing so, he did not kick her on the left side of her face nor did he push her down on the bed. It was not until Ms. Wilson slapped Pillock until Pillock became frustrated and pulled Ms. Wilson's hair.

WHEREFORE the Defendant respectfully requests that this Honorable Court sustain his objections to the presentence investigation report and sentence the Defendant accordingly.

_____

[1]The Defendant notes that his age at the time of the offenses referenced in paragraph 62 was 30 and not 40.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was furnished by

U.S. Mail on October 12, 2000 to Bertha Mitrani, Esquire, Assistant United States Attorney,

500 East  Broward Boulevard, Suite 700, Fort Lauderdale, Florida 33301 and Kathryn

Gomez, United States Probation Office, Federal Courthouse, 299 East Broward Boulevard,

Room 409, Fort Lauderdale, Florida 33301.

ENTIN, MARGULES & DELLA FERA, P.A.
200 East Broward Boulevard
Suite 1210
Fort Lauderdale, FL 33301
Telephone: (954) 761-7201

By: _____
    ALVIN E. ENTIN
    Fla. Bar No. 127027

STATEMENT OF: GREG PILLOCK                          C/N BS00-04-13368

Broward County Sheriff's Office. It is 4/26/2000 at 2251 hours. Uh, this
will be a statement in reference to BSO case number 00-04-13368. And
it's with, uh, Greg Pollock. Uh, we are here at the Palm Beach Sheriff's
Office and, uh, we'll be talking, uh, to him here.

Q.    Greg, you understand that I'm a police officer, uh, for the state of
      Florida, empowered to take sworn statements?
A.    Correct.

Q.    (UNINTELLIGIBLE) of people here in the state of Florida?
A.    Correct.

Q.    Uh, what's your full name?
A.    Gregory Allen Pillock.

Q.    And your date of birth?
A.    10/20/53.

Q.    Okay Greg, uh, we, uh, we spoke earlier about whether or not you
      wanted to have an attorney and all those kinds of things, right?
A.    Correct.

Q.    And you've decided that you didn't want one right at this time?
A.    That it was better to cooperate in, um, hopes that, um, well in, um,
      um, um, favorable leniency and, uh, by the court, and, um,
      cooperation and helping, um, stop this, um, so it doesn't go any
      further and continue.

Exhibit "A"

STATEMENT OF: GREG PILLOCK                          C/N BS00-04-13368

Q.   Okay, that's fantastic. We haven't coerced you in any way, haven't
     beaten you or caused you any, any harm or anything like that?
A.   No and I don't believe you will.

Q.   We, we won't either. We haven't, we've provided you everything
     you wanted? Water, things like that?
A.   Yes.

Q.   We explained to you that you can talk to us or talk to us later and
     you understand that whether you talk to us now is up to you? Own
     choices and all those things, right?
A.   Yeah, the reason I'm talking is because, um, I would, um, you
     know, I was told by you that I would be, um, in your other, arrest,
     uh, your other associates, um, that I would be, um, considered for,
     um, leniency. Um

Q.   That it was better off with cooperation?
A.   Yeah.

Q.   Through the courts that, in our experience?
A.   Yeah cause you.

Q.   It's been beneficial to those who have cooperated, right?
A.   Because, um, you, you pretty much got me red handed and I mean
     it was all pretty cut and dry.

Q.   Okay, we haven't, we haven't coerced you in any way to talking,
     you understand you don't have to if you don't want to, correct?
A.   Correct.

Q. And that anything you say now we're going to write down and present to a judge so that he understands your cooperation fully of everything that is going on?

A. Exactly.

Q. Okay, and that if you should want to talk to us now and not talk, you can stop at any time, right?

A. Correct.

Q. Okay, right we were talking earlier about some, uh, things that occurred on last Sunday, which would have been Easter Sunday, the 25th?

A. Correct.

Q. Of April?

A. Correct.

Q. Uh, can you talk about how those circumstances came about?

A. Well, um, everybody wanted ta make a run for the money and try to earn some money and

Q. (UNINTELLIGIBLE) the money being bringing some marijuana in from the islands?

A. Bringing some marijuana in from Jamaica.

Q. Okay, and who's everybody?

A. Um, Larry and me and, um, the Jamaicans and, um, um, some other, it (UNINTELLIGIBLE) me and Larry and the Jamaicans, um, that we're talking and, um, put it, pretty much put it together.

STATEMENT OF: GREG PILLOCK                                C/N BS00-04-13368

Q.    Okay, so this, this, what we're gonna talk about is, is, some,
      bringing some marijuana into the country from, from Jamaica?
A.    Correct.

Q.    On an airplane?
A.    Right.

Q.    Okay, just for this instance, could you raise your right hand for me?
      Do you solemnly swear to tell the whole truth and nothing but the
      truth so help you God?
A.    I do.

Q.    Great, okay, when did you first come up with this idea that you
      were going to, uh, to, to try and make some money doing this?
A.    Um, I had gotten the same situation, I got busted about, in 1980,
      about twenty years ago, doing the same thing with, um, a different
      pilot from Tennessee. I met Larry in prison and, um, proposed it to
      him and, um, we'd both got out of prison about the same time and,
      uh, we decided to, um, to do this. That it would be easy to do and,
      um, we would go ahead and do it.

Q.    Okay, and Larry is Larry London?
A.    Correct.

Q.    Uh, where does he live at?
A.    He lives in, uh, Wadley, Georgia.

Q.    Okay, and he's a pilot?
A.    Correct.

led                              Page 4 of 48

Q.  Okay, and what we're talking about doing is bringing some drugs in
    from the islands, right?

A.  Bringing a plane load of pot in and kicking it out in the ocean and
    letting the boats pick it up.

Q.  Okay, so when it became more specific, uh, as to a date what, when
    was that that the idea became more specific?

A.  Uh, it was actually gonna go the week prior to Easter and, um, it got
    delayed because the, um, Larry's company, um, that he's employed,
    um, that he chartered the plane from, um, they didn't, they didn't
    know what he was doing, that, um, but the overflight permit to fly
    over Cuba was not granted because it was filed late so it had to be,
    unfortunately, it was put off until Easter Sunday.

Q.  Okay.

A.  And it was delayed for a week.

Q.  Okay, now whose, whose contact was it in the islands that, that
    obtained the, the marijuana?

A.  Um, it was my contact.

Q.  Your contact. And what was that guy's name?

A.  Um, Willow.

Q.  Willow? Is that his full name or?

A.  That's his nickname.

Q.  That's his nick, do you know his true name?

A.  No.

Q.  Have you purchased some or obtained marijuana from him in the past? That's how you know him?

A.  Um, yeah, he, he, worked, uh, a long time. Way back, twenty years.

Q.  That's how you knew him?

A.  Yupe.

Q.  Okay.

A.  He, he actually found out how to contact me and, um, and, uh, that's how that worked out. That's how he got involved and then

Q.  Okay, so Larry, Larry was, uh, Larry instructed you to do something and have the, the person Willow or somebody, a Jamaican person, call to rent a plane, right?

A.  Yeah, Larry instructed me to tell Willow to call and, um, inquire to, um, rent the airplane and, um, and Larry furnished the, um, phone numbers and the name of the company and the address for the, um, um, company to rent the airplane and, and requested Larry to put the, um, pilot.

Q.  What company was that?

A.  Um, Tar Heel Aviation.

Q.  And where are they located at?

A.  In, in North Carolina, I think. I, I

Q.  Okay, is that as close as you could remember as to where they are located? North Carolina?

led                                    Page 6 of 48

A.   Um, it might be, um, I, I don't know the name of the town. I can't
     remember it.

Q.   In the state of North Carolina, though? You think so?
A.   I think it's North Carolina.

Q.   Okay, that's fine. What kind of plane were you instructed to rent by
     Larry?
A.   A, um, we weren't instructed to rent, um, a specific type. Larry
     knew that, um, he would get that Cessna Caravan and that was the,
     um, the right piece of equipment, um, to do that.

Q.   Okay, so you then, after Larry told you to do this, you contacted
     Willow who then called Tar Heel Aviation and requested, uh, a
     plane?
A.   Right, for his cargo.

Q.   For his cargo. And how much did that cost? Do you know?
A.   Fifty seven hundred.

Q.   Fifty seven hundred dollars? And what date did, uh, Willow tell Tar
     Heel Aviation that he needed it for?
A.   Um, I'm not sure what the date was but, um, I think it got changed
     to the week prior, the Sunday, um, prior to Easter Sunday.

Q.   Okay.
A.   And then it was cancelled.

Q.   And then it was cancelled and
A.   Due to the overflight, um, not being (UNINTELLIGIBLE)

STATEMENT OF: GREG PILLOCK                                    C/N BS00-04-13368

Q.    Okay, so then once the plane's rented and, uh, and you have your
      plan of, of how it's gonna come about, what happened next?
A.    Um, we got the boat, I got the boat people together.

Q.    Who are the boat people?
A.    Eric and Terry.

Q.    Eric what? What's his last name?
A.    I, I don't know Eric's. It's, oh, it's Johnson, Eric Johnson.

Q.    Okay.
A.    He, uh, Eric worked with me laying carpet so I knew Eric and I
      asked Eric if he knew any boat people and, um, Eric, um, found a
      boat captain and he, Eric provided the crew. The captain and he
      was part of the crew.

Q.    What was the name, the captain's name?
A.    I found out later that, I never knew the guy, but, uh, his name was
      Terry, an older gentleman.

Q.    Do you know his last name?
A.    Um, no I don't know his, uh, I don't know his last name now.

Q.    Okay, so you acquired a boat crew and the plan was that you were,
      that, uh, what was the plan? Larry was gonna go to the islands with
      this plane?
A.    Larry was gonna take the, um, airplane down there on a, uh,
      legitimate, um, cargo run, land and refuel at Kingston and, um,

STATEMENT OF: GREG PILLOCK                                    C/N BS00-04-13368

A.    (continued)
      leave Kingston and, um, go to the, um, a different strip like in the,
      you know, on the way back, in Jamiaca and stop there and get, uh,
      loaded up.

Q.    Where's that strip at?  Do you know?
A.    It's on the, um, map.  It's Tulloch, T U L L O C H.  And that's
      where he landed and, um, I think it's about three thousand feet so it
      was just big enough for him ta get, get in and get out of there with
      his cargo, his, his marijuana cargo.

Q.    Okay, and then he was then to fly back to the United States?
A.    And then he, uh, was to fly, um, he flew back over, um, Cuba and,
      um, entered the, um, um, he, um, came back over Cuba and he
      dropped the load to the boat people.

Q.    Okay.
A.    At ten twenty and then he landed at Fort Lauderdale and then, um, I
      think after he cleared Customs cause he was empty then, at Fort
      Lauderdale International, then he, um, I believe he took the plane
      back up to Executive at Banyon.  I'm pretty sure that's where
      Johnny went and picked him up, Johnny Minix.  And then, um, and
      then that's when all the trouble started where Larry wanted, um, his
      fair share, his full share of three hundred and fifty pounds and he
      threatened with, um, you know, violence and guns and weapons
      and, you know, the boat people were still working and everybody
      had to stop working to pacify Larry cause he was, um, enforcing
      Gestopo type, um, tactics and everybody was afraid that, um, the
      whole thing would just blow up cause Larry was all blown up and
      he was real, um, he was real mad because Rod wasn't on the boat

A. (continued)
because the Captain already had his crew picked for the boat and Larry, um, tried to throw Rod on the boat, um, at the last moment, in the eleventh hour and the captain, um, said that no he had his crew picked and Larry could not put Rod on the boat as a fourth person but Larry never knew that so, um, Rod ended up being a, um, look out person at, um, Hillsoboro Inlet, along with myself, to make sure the coast was clear for the guys to come back and get through with the boat.

Q. After the, uh, plane had already dumped its cargo?

A. Yeah, after they dumped the cargo and, um, then they took it over to the captain's house which was very the inlet and, um, that made it convenient, um

Q. Okay, let's back up just a, how much, uh, marijuana were we talking about that was gonna come in from the islands?

A. The figure that I, uh, was, um, from Willow was, um, eighteen fifty four.

Q. Eighteen hundred and fifty four pounds?

A. That was the total. That was the maximum weight. I don't know if that included the wrappings that it was in or but it was approximately eighteen fifty four.

Q. Okay, so he leaves, uh, that airstrip in, in the islands with eighteen hundred and fifty four pounds, flies it across Cuba?

A. Uh huh.

STATEMENT OF: GREG PILLOCK                                C/N BS00-04-13368

Q.   And comes into the United States.  Was there specific coordinates
     he was supposed to come in at?  Do you remember?
A.   Yeah, he was, um, going over to, uh, 86 and, um, no 80 and 24, 80
     and 26.  That's where he was supposed to come over.

Q.   80 and 26?
A.   I believe so, 80, 80 and 26.  Its was, um, like seven miles directly
     off of, um, Hollywood, um, Boulevard.  Just a little bit to the south.


PHONE RINGING


A.   It the red button.  Is that my wife?

Q.   Okay, so they, they were coming in off of, uh, off of Hollywood
     Boulevard?
A.   80 and 26.  The reason he come through that corridor and it's very
     important so you can stop the drug smuggling that's going on now
     and still happening is you need to position a cutter out there because
     that's on the IFR corridor coming into 9 right or 9 left.  You can use
     either one and, and hit that spot right there.  80 and 26.  It's right on
     the IFR corridor.


PHONE RINGING


led                          Page 11 of 48

Q.   I'm going to turn this phone off as soon as I can figure out how to turn it off. There. I think we got it. All right, so once he reached that spot in the corridor?

A.   Uh huh.

Q.   How did he contact the boat people?

A.   They had a radio.

Q.   So the plane had a radio and the boat people had a radio?

A.   Yeah.

Q.   And the boat people as we know it is who? It's?

A.   Eric, Terry

Q.   Johnson?

A.   Yeah, Eric Johnson and Terry

Q.   Terry, who you don't know his last name but he's the captain?

A.   Right, he's the captain.

Q.   And whom else?

A.   I don't know that other guy's name.

Q.   Just one other guy?

A.   Eric's friend.

Q.   Okay and their on their boat at the same coordinates?

A.   Yeah, they're out there at 80 and 26.

Q.  So they say something over the radio. Was there a special word or anything they were supposed to use or?

A.  Um, I guess Larry made contact with them and they, um, they dropped the stuff out.

Q.  Were you able to hear this radio conversation?

A.  I, I couldn't hear it.

Q.  Okay.

A.  I had another radio, um, but I, I just vaguely. I knew he was there but I, that's all I heard. I, he, I heard him say something like can you see, can you hear me. I think he said can you hear me. Uh, I (UNINTELLIGIBLE) that's what I heard.

Q.  Uh huh.

A.  Something like that.

Q.  Okay, and then once

A.  But I was all the way up in Hillsoboro so

Q.  That's right.

A.  I couldn't hear very good but I did hear the transmission, um, from Larry because, um, the radio works better that way.

Q.  Okay, so he says can you hear me and apparently he could and then is there any, like any other signals from the boat people to the plane at that point?

A.  They, uh, they probably shined a spotlight at him. Um, to let him know where they were.

Q.    Okay.

A.    But they said he was right on target.

Q.    Okay, so he, then what happens next?

A.    They threw it out.

Q.    They threw the marijuana out of the side of the plane?

A.    Yeah, Larry, Larry had a kicker in there, his buddy Billy.

Q.    Billy, do you know Billy's last name?

A.    No.

Q.    Okay, so Billy then kicks the, uh, marijuana out the door?

A.    Yeah, Billy kicked the load out.

Q.    Okay, and they were at about what altitude did you, do you
      remember?

A.    I think that they have to be around three thousand feet. At that, um,
      point, cause they were on a, uh, IFR flight plan and the IFR flight
      rules are very strict and you must, um, it's almost like you're flying
      through a tunnel. So you have to, um, you can't deviate and Larry
      had worked, um, you know, he's probably got about five thousand
      hours as a commercial pilot so he was pretty knowledgeable about
      knowing how they would direct him in and out.

Q.    Okay, so then the marijuana's kicked out and it's from about twenty
      five hundred or three thousand feet?

A.    Uh huh.

STATEMENT OF:  GREG PILLOCK                                    C/N BS00-04-13368

Q.   And, uh, it hits the water, right?
A.   Yupe and they exploded.  They all busted up.

Q.   So there was how many, how many cubes?
A.   Four.

Q.   Four?
A.   Four cubes.

Q.   And they all blew apart, meaning, uh, small cubes is, uh
A.   Yeah (YAWNING) was wrapped up and tied in plastic and they had
     nylon ropes around it and the ropes actually cut some of the stuff
     like a Samari sword and busted it wide open where it was exposed
     and, um, I'm sure that some of it, um, ended up as seaweed.

Q.   Um.
A.   And, uh, probably went below the water level because, um, the
     nylon ropes and the force of the impact cut it and that's why, um,
     all of it is not accounted for.

Q.   Okay.
A.   That's my opinion.

Q.   Okay, so then the, the boat people, for lack of a better term, then,
     uh, pick up all the (UNINTELLIGIBLE)
A.   They gathered up what they could find.

Q.   And they drove back, on their boat, back to, uh
A.   Hillsboro.

Q.   Hillsboro Inlet. And who was there, uh, at that time?

A.   (YAWNING) only person that was there was me, no, I wasn't there, I was in the inlet. Um, Mike was just sitting in the house.

Q.   Now, who was at the inlet waiting for the boat to come back?

A.   I was there.

Q.   You and

A.   And Rod.

Q.   And Rod and you had a radio?

A.   Um, I had a cell phone.

Q.   You had a cell phone. What was your purpose for being at the, uh, inlet?

A.   Um, just to, um, see if, um, there was any, um, um, you know, um, Pompano air boat or Broward County Sheriff boat or, you know, Marine Patrol boat cause, um, Eric called me on the phone and asked me if everything was okay and I said, you know, that everything was fine. So Eric called me from his cell phone.

Q.   So Eric, Eric called you from his cell phone to your cell phone while you were at the inlet watching for any police that might be there?

A.   Correct.

Q.   Okay, and you said everything was fine and they came in?

A.   Correct.

STATEMENT OF: GREG PILLOCK                                    C/N BS00-04-13368

Q.    Okay, and they came in through the Hillsboro Inlet and went
      directly to the captain's house and the captain we know is named?
A.    Terry.

Q.    Terry, okay, do you know where his house is located at? Do you
      know an address or anything?
A.    Yeah.

Q.    What's the address?
A.    Um, 2741, uh, Northeast 23rd Court.

Q.    Okay.
A.    I think that's it, 2741, 2741?

Q.    I don't know.
A.    2731.

Q.    One of those two?
A.    Yeah.

Q.    Okay, just whatever you can remember to the best of your
      recollection. So once at, uh, the boat captain's house, what
      happened next?
A.    Um, um, I came back over and, um, unloaded it, well the guys
      unloaded it. The guys unloaded it.

Q.    You and Rod were at the inlet. Do you know Rod's last name?
A.    No.

STATEMENT OF: GREG PILLOCK                                C/N BS00-04-13368

Q.  Okay, and you and Rod came back to the boat captain's house
    where the boat now is with the marijuana. Who else is there at that
    house?

A.  Um, who else was there. Um, the boat crew and me and, uh, my
    friend Mike.

Q.  Okay, and the boat crew is Terry, Eric and an unknown person?

A.  Right.

Q.  Yourself and your friend Mike?

A.  Right.

Q.  Okay, what did you guys do collectively then?

A.  Um, the boat crew, um, pulled a cooler up, a white cooler and, um,
    it had about, um, maybe three of those twenty five pound, um,
    cubes of marijuana in it and they dumped it out on the kitchen floor
    and they kept going and getting more and bringing it back. Eric
    and, and the other guy that I don't know his name is.

Q.  Okay. What'd you guys do inside the house after they brought it
    in?

A.  (YAWNING) I was watching it all come in and, um, the kitchen
    door opens up to the garage and I was unpacking it into the van.

Q.  And whose van is this?

A.  Mine.

Q.  Okay, and what kind of a van is it?

A.  It's an 89, um, Ford, um, cargo van.

STATEMENT OF: GREG PILLOCK                                C/N BS00-04-13368

Q.  Okay do you know your tag number on your van?
A.  No.

Q.  Okay, so, and it was parked in the garage?
A.  Yeah, it was parked in the garage at the house.

Q.  Okay, so you packing in it in the van, the boat crew, Eric and, uh,
    this unknown friend were hauling it from the boat to the kitchen.
    What was Terry doing? Terry's the boat captain.
A.  (YAWNING) Terry wasn't, Terry wasn't doing any of that cause he
    couldn't lift it. You know, it was too much for him. He was just,
    um, sitting on the couch.

Q.  What was Mike doing?
A.  He was just watching what was going on.

Q.  Okay, and you packing it in the van?
A.  Yeah, I was helping the other guys pack it in the van.

Q.  Who were the other guys?
A.  Eric.

Q.  Oh, so they helped put it in the van?
A.  Yeah the, those other, and his buddy.

Q.  And his buddy that you don't know his name. Okay, so then, uh,
    now after Larry London, the pilot and his kicker, Billy, his that, he's
    the kicker?
A.  Uh huh, right Billy.

STATEMENT OF: GREG PILLOCK                                    C/N BS00-04-13368

Q.   After they kicked all the marijuana out of the plane, where did they,
     they went to Fort Lauderdale Executive, right?
A.   No, they went to, um, Fort Lauderdale International and landed and
     cleared Customs.

Q.   And after clearing Customs?
A.   After clearing Customs they, um

Q.   Flew to Fort Lauderdale Executive?
A.   Flew up to, um, Banyon at Fort Lauderdale Exec.

Q.   And that's where the plane stayed?
A.   Yes.

Q.   And eventually someone named Rod picked them up?
A.   No Johnny.

Q.   Johnny, okay.
A.   Johnny Minix went and picked Larry

Q.   And when did Johnny Minix get there?
A.   Um, Johnny Minix must have gotten up there around midnight and
     picked em up at Banyon after they cleared Customs and went up to
     Executive at Banyon. Johnny would have picked them up at
     Banyon at Exec around midnight. And they called me and, um, was
     all mad because, uh, Rod couldn't get on the boat and, um, Larry
     got all mad and he got pretty hostile.

Q.   He wanted Rod, his friend, on the boat to protect his interest in the
     marijuana?

led                                Page 20 of 48

A.    Exactly.

Q.    Okay and, the, the plane actually came overhead out on the ocean at
      about ten twenty, right?

A.    Correct.

Q.    And it took from ten twenty till how long till the boat actually made
      it to the boat captain's house?

A.    I think they got back around twelve thirty.

Q.    And at what time did, uh, Larry London get picked up by John?

A.    Um, I think it was around twelve o'clock midnight.

Q.    Okay, so John Minix had no other role in this other than he went
      and picked up Larry London at that point, right? He wasn't
      involved in (UNINTELLIGIBLE)

A.    Right.

Q.    (UNNTELLIGIBLE)

A.    Right.

Q.    So he came and picked up Larry London at Executive Airport and
      drove him to where?

A.    He, um, they rode around somewhere and then around, maybe one
      o'clock in the morning, my cell phone rang and it was Johnny
      calling from Johnny's cell phone. And Larry was on the other line
      yelling and screaming at me.

Q.    (UNINTELLIGIBLE)

A.    Because Rod didn't get on the boat.

led                            Page 21 of 48

STATEMENT OF: GREG PILLOCK                              C/N BS00-04-13368

Q.   Okay, what happened next?
A.   Larry said he was gonna come over and take what was his, um,
     whether we liked it or not. And, um, he said that we had to put
     three hundred and fifty pounds in Rod's truck or he was gonna
     come over and take it by force, using, um, weapons and I do believe
     that Johnny was packing a gun that evening. And, um, and, um, he,
     he said he was gonna do, that they were gonna shoot us up. They
     were gonna. I, I thought they really might have killed us.

Q.   Okay, so you went and met with, uh, Larry to calm him down?
A.   Um, I tried to because after that, you know, I agreed that, you
     know, I'll give you the three fifty, you know, just, it's not fair but,
     uh, you're taking my share cause, you know, everything wasn't
     recovered and you're just, you're taking more than you should be
     taking so anyways he, um,

Q.   Where'd you go meet him at?
A.   We met him over at Denny's on North Federal in Pompano.

Q.   Who's all we?
A.   Me and I asked Terry, the captain to come with me so I'd have
     someone on my side and, um, there was, um, me and Terry and
     Rod and Johnny and Larry but Larry stayed outside and Johnny
     came in and Johnny said he's really pissed off. He says if you don't
     give him his shit, um, we're gonna, Johnny said we're just gonna
     go over there and fucking, um, take it. And, um, Johnny got real
     forceful and, uh, it wasn't polite and we tried to be nice and, and,
     um, they threatened with, um, with violence and, um, and, and, I
     know that Johnny, um, I've seen Johnny with a nine millimeter
     shooting it and I, I, I didn't know anybody else that had weapons. I

led                              Page 22 of 48

A.  (continued)
don't have one. I, I haven't had one for twenty years and but, um, I
do believe that Johnny was packing a gun, that nine millimeter and
maybe he a throw away gun and Johnny said that Larry was ready
to come over there and shoot us and kill us. If, if we didn't, if he
didn't get his shit right now and give it to Rod and put Rod on the
road and send Rod back to, uh, Georgia, with Larry's three hundred
and fifty.

Q.  Three hundred and fifty pounds of marijuana?
A.  Three hundred and fifty pounds of marijuana.

Q.  Okay, so after that meeting, what'd ya end up doing?
A.  We, um (YAWNING) Rod drove the truck over and, um,

Q.  Over to?
A.  Larry and Johnny stayed together and, um, Rod drove the truck over
with, um, me

Q.  To, to where?
A.  To the boat house.

Q.  To where the Captain lives where the drugs were?
A.  Right.

Q.  Okay.
A.  And, um, loaded up the boat.

STATEMENT OF: GREG PILLOCK                    C/N BS00-04-13368

Q.  Loaded up the?
A.  I mean loaded up Rod's truck with three hundred fifty pounds and
    we weighed it right there in the kitchen on a bathroom scale and,
    um, and, um, they, they were still pissed off when they left and, um,
    you know, I was thinking


    END OF SIDE ONE OF TAPE

Q.  That was the end of a sixty minute tape and now we just turned it
    over and we'll resume right back where we're at. It is
    approximately 2323 hours right now. Okay, so you loaded up his
    truck, Rod's truck?
A.  We loaded up Rod's truck and then Rod and I left and then Rod
    called Johnny and Johnny's, um, they had the two way talkie and,
    um, cause I wanted to go see Larry and see if he was, you know,
    gonna be okay now and not being like all violent, you know, cause
    he wouldn't even talk to, uh, any, he wouldn't even talk to me and
    him and I were supposed to be friends but

Q.  So you're in the truck with Rod with the marijuana in the back?
A.  Yeah and I couldn't believe Larry was acting (UNINTELLIGIBLE)

Q.  And you were going, you were going to meet Johnny?
A.  Yeah.

Q.  John who?
A.  John Minix and Larry.


led                          Page 24 of 48

STATEMENT OF: GREG PILLOCK                                C/N BS00-04-13368

Q.  And Larry London?
A.  Right. And, um, Larry didn't want me to be in the truck with Rod so Rod, um, took me home and dropped me off and I never met them after that. But I don't know where they were.

Q.  About what time was that?
A.  I think it was around two thirty, three o'clock in the morning.

Q.  Okay, so then you went home?
A.  I went home and, um,

Q.  What'd ya do next?
A.  Um, I went back over to the (YAWNING) I went back over to the boat house. Um, and asked the guys if they would go back out and try to find the rest of our stuff. And that Larry would be up and he would fly at first light to help spot what was missing.

Q.  And did they?
A.  No, they never, they never answered the phone so they never had any intentions of going up and helping us find the rest of the stuff.

Q.  That being Larry and
A.  Larry and Johnny.

Q.  Johnny, they never, they never went up and flew and they didn't return your phone call?
A.  No.

led                                    Page 25 of 48

Q. Did the boat, uh, crew, being Eric and who go out and?

A. Eric and, um, and, um, the, his friend went back out to see, Terry wouldn't go, the captain would not go, went back out and, um, they got boarded off of, um, off the beach somewhere. I don't know, they were a few miles out and they got boarded by the Coast Guard.

Q. How do you know that?

A. They told me that they got boarded.

Q. Did they call ya from there or did they tell you when they got back?

A. Yeah, he, he called me on his cell phone.

Q. He called you from the (UNINTELLIGIBLE)

A. Eric called me on my cell phone and, um, told me that they got boarded and, um, and then the captain Terry, um, told them to go, don't come back to the house, it's too late, I mean, wait, wait till it get light. Just go down to Port Everglades and take a nice, um, cruise up the Intracoastal.

Q. Okay.

A. And that's what they did.

Q. And that was the Coast Guard that boarded them, right?

A. Yes.

Q. About what time in the morning was this?

A. I think they got boarded around four thirty in the morning.

Q. And this would be Sunday night, Monday morning?

A. Correct.

STATEMENT OF: GREG PILLOCK    C/N BS00-04-13368

Q.    Okay, so they come back to the house. They did not find anymore of the marijuana that was out in the ocean?
A.    Exactly.

Q.    Okay, what happens after that?
A.    Um, Terry took his share and put it, as soon as they got boarded, Terry took his share, like a hundred and seven pounds and put it in the trunk of his car. And, um

Q.    What kind of car was that?
A.    A blue car.

Q.    A blue?
A.    Four door, Hyundai.

Q.    Hyundai. Where was that car at?
A.    In, um, in his driveway.

Q.    Okay.
A.    And, um, then I took my van and, and drove out and I took, I went home.

Q.    You went home with your van. How much was in your van, how much marijuana was in your van?
A.    Um, um, seven sixty.

Q.    Seven hundred and sixty pounds?
A.    Yup.

STATEMENT OF: GREG PILLOCK                                    C/N BS00-04-13368

Q.    Okay.
A.    And I found that out after they totaled it up.

Q.    Okay, so you went to your home and what did you do then?
A.    Um, it was, um, coming to be daybreak and, um, I started calling
      Larry on the, trying to get Larry put he, he didn't never answer.

Q.    You were trying to get him to go up and fly and find the rest of the
      marijuana?
A.    Yeah.

Q.    Okay, he didn't answer ya. So what'd you do?
A.    Um, just, just waited and waited.

Q.    At some point, you, uh, gave some marijuana, gave some of the
      marijuana to someone else?
A.    Um.

Q.    You had mentioned a name, Paul?
A.    Oh, that happened, um, yesterday.

Q.    That happened yesterday. That would be Tuesday?
A.    What's, what was today when I got, um

Q.    Wednesday.
A.    It would have been Tuesday evening, around, um, nine thirty pm.

Q.    Tuesday evening around nine thirty?
A.    Yup.

STATEMENT OF: GREG PILLOCK                          C/N BS00-04-13368

Q.   You had this seven hundred and thirty pounds in your?
A.   Seven sixty.

Q.   Seven hundred and sixty pounds total in your van from Monday, early morning, till Tuesday, nine o'clock?
A.   Yeah.

Q.   Okay, just sitting out in front of your house?
A.   Yeah, in my white, in the white cargo van.

Q.   In your white cargo van, okay. And now Tuesday at, uh, nine o'clock or so, uh, who did you give some marijuana to?
A.   Paul.

Q.   Paul what?
A.   He's a Jamaican fellow that financed the whole thing. I don't know, um, his last name, I never did.

Q.   Okay, what do you mean by financed the whole thing?
A.   He's the one that, um, put up the front money with the Jamaicans to, um, get the, um, to buy the material.

Q.   Buy the marijuana?
A.   And he gave Larry, um, he, he gave the money, um, to, um, put up the, um, the, um, the money to rent the airplane. To charter the airplane. That was fifty seven hundred dollars. And he gave Larry, um, like, um, twenty four thousand cash before Larry left.

STATEMENT OF: GREG PILLOCK                    C/N BS00-04-13368

Q.   And that was to purchase the marijuana?
A.   No, no Larry got, um, advance money. Larry got twenty four
     thousand in advance before, um, he would decided to do the deal.
     That was his, um, requirement.

Q.   Okay.
A.   He wanted advance money.

Q.   How did the money get to Jamaica to purchase the marijuana?
A.   I don't know.

Q.   But it was Paul who orchestrated that?
A.   Correct.

Q.   You knew the guy in Jamaica who was actually selling the
     marijuana. Did you introduce Paul to him or?
A.   No.

Q.   Did Paul know him also?
A.   Paul's Jamaican and he knows his own people down there. So they,
     they worked all that amongst themselves.

Q.   You didn't introduce Paul to your contact when you
A.   No.

Q.   Got the marijuana, okay.
A.   No, I, I don't know where the marijuana, I don't know where the
     marijuana came from, which specific growers or which family or if
     it came from several different people, um, growers, which
     sometimes it does. Um

STATEMENT OF: GREG PILLOCK                          C/N BS00-04-13368

Q.  So the Willow that you mentioned before is just someone you've, you've gotten marijuana from in the past?

A.  Yeah, from twenty years ago.  Um, I knew Willow and, um,

Q.  But he wasn't the one who supplied the marijuana this time?

A.  No.

Q.  Okay, I wanted to clarify that.  Okay, so you gave Paul so Paul has bankrolled this whole operation?

A.  Yup.

Q.  Has anybody else received any money from Paul other than Larry?

A.  Um, Paul gave me, um, some working capital so I could, um, um have some expense money for, uh

Q.  How much did you receive?

A.  Um, a total of, um, seven thousand dollars.

Q.  And what did you spend it on?

A.  Um, I, um, let me think.  I bought, um, what did I spend money on? Entertainment, spent some money on entertainment.  Um, spent, um, money on some, um, radios.  Spent money at Home Depot. Spent money at

Q.  What'd ya buy at Home Depot?

A.  Um, I bought some tape and some, um, you know, stuff like that..

Q.  The radios were the radios that were used?

A.  At the inlet.

led                              Page 31 of 48

STATEMENT OF: GREG PILLOCK                                        C/N BS00-04-13368

Q.  At the inlet.
A.  Motorola radios.

Q.  And was that the same radios that were, that used to communication between the plane and the boat?
A.  No.

Q.  They were different?
A.  They wouldn't work that way.

Q.  Okay, uh, anything else that you bought?
A.  Um, I rented, I rented the van, the Enterprise van.

Q.  To transport the marijuana in?  All right, anybody else receive any money?
A.  I gave Terry a little bit of money just spending money for gasoline money.  He bought a GPS, um, I gave him money for that.  I had to buy him a gaff, a long gaff.  So there was, um, he probably got about, maybe six or seven hundred bucks, Terry did.

Q.  Okay.
A.  The captain, he needed the money for gas and he was, he didn't have any money.

Q.  Okay, so
A.  Um, there was some other things, I'm sure I bought.  It's just, um

Q.  Okay, that's fine if you can't think of it right now.  Now on Tuesday at about nine thirty, you were saying that Paul who gave

Q. (continued)
you all this money to bankroll this operation, received his
marijuana, right?
A. Yeah.

Q. At your house?
A. Yup.

Q. And, uh, how much did he exactly receive?
A. My calculations, he received four thirty.

Q. Four hundred and thirty pounds?
A. Correct.

Q. Of marijuana?
A. Yeah four hundred and thirty pounds of marijuana, Paul got that.

Q. Okay, and Paul, what did Paul load that into?
A. He loaded that into, um, his, um, minivan.

Q. Do you know what kind of van it was?
A. A dark green minivan.

Q. Do you know the brand name or anything?  Do you know a tag
number or a license plate number?
A. Yeah, one thing I did remember was his tag number.  It had an
unusual tag number.  The last four, the last three digits was 4 1 1,
like information.  And then, um, I, I think the first three, the first
number was a three and I think it was P H M.

STATEMENT OF: GREG PILLOCK                    C/N BS00-04-13368

Q.   3 P H M 4 1 1. What state was that?
A.   California.

Q.   California license plate, okay. Did you load it into the van with him
     or?
A.   Yeah, both of us did.

Q.   Just the two of you?
A.   That's it.

Q.   At your home?
A.   Yup.

Q.   And, um, and that was about nine o'clock on Tuesday night?
A.   Nine thirty.

Q.   Nine thirty Tuesday night. Where'd he go after that?
A.   He, um, asked me to follow ta, um, to follow him down to, um,
     Atlantic Boulevard and I95 and he wanted to go south and I
     followed him down to Atlantic Boulevard and I95 and he got on and
     he went south.

Q.   Why'd he do that?
A.   I don't know. I thought he was going to New York but he went
     south.

Q.   Do you know where he took that marijuana?
A.   No.

STATEMENT OF: GREG PILLOCK                                          C/N BS00-04-13368

Q.    But somewhere south, okay.  Have you spoken to Paul since that
      time?
A.    No.

Q.    Haven't seen him at all?
A.    No, not since, um, last night.

Q.    Okay, do you know Paul's telephone number?
A.    Um, I have it somewhere.

Q.    You don't know it off the top of your head?
A.    No.

Q.    That's fine.  Okay, so then you were left with how much?
A.    Three thirty.

Q.    Three hundred and thirty pounds, and that was for you?
A.    Well, I was gonna hold that, um, for Paul, when he got done with
      that other thing.

Q.    Okay, so this was Paul's and yours?
A.    Yeah, this was gonna be Paul's and mine and however things
      worked out with Larry.  Um, cause he, Larry took more than his
      share.

Q.    Okay.
A.    So he  was, um, he was not being fair.

STATEMENT OF: GREG PILLOCK                                    C/N BS00-04-13368

Q.   All right, so at some point, um, then after that, after, after Paul
     leaves with that, uh, that night, did you speak to anybody else or do
     anything else that Tuesday night?

A.   No, I went to bed.

Q.   Okay, and uh

A.   That was it, it was, it was late.

Q.   Wednesday, what'd you do?

A.   Wednesday?

Q.   That's today?

A.   Today I, I got up and, um, just kind of messed around a little bit. It
     was a slow day. And, um,

Q.   Did you receive a phone call from anybody?

A.   Yeah, I was actually out and my girlfriend received a phone call
     that, um, that, um, Terry and Eric were in jail and they wanted
     some, um, help with some bond money. And I didn't even know
     what Eric's last name was, you know.

Q.   Did you know what they got arrested for?

A.   I didn't, I didn't know if they got arrested for DUI or, um, if they
     got arrested for the, um, buy or, um, if they got arrested for the, um,
     for the, um, marijuana.

Q.   Okay, so what did you decide to do once you heard that?

A.   Um, well it just scared me and I, um, I grabbed my bag and I was,
     um, gonna try to save the rest of the load and get it out of there
     because I didn't know if, I didn't know why they called me at my

STATEMENT OF: GREG PILLOCK                                    C/N BS00-04-13368

A.    (continued)
      house, um, from the jail and that scared me and I didn't know if
      they got arrested for DUI or if they got arrested for drugs or
      something. I, I didn't know so I, it, it scared me and I didn't want
      to get arrested so I, um, and I didn't want to lose the marijuana that
      was left that was for Paul. Um, and, um, my share was in there too,
      my share was gonna be in there. So, um,

Q.    In the van?
A.    In the, in the Enterprise rent a van, yeah. And, um, I, I wanted to
      get it out of there so I, um, I grabbed my stuff and, um, I, um, went
      over to the Circle K and I'm thinking oh I'm gonna get arrested
      and, um, I, I, um, I threw my numbers away and then I, then I
      started thinking I need them numbers and I, I went back in the
      garbage can and I was going through the garbage can to try to find
      the numbers cause I like, I was going stir crazy and, and I lost my
      numbers and I said I'm gonna need those numbers because I don't
      know how to get in touch with Willow and, um, you know, I didn't
      have, I, I don't have Larry's number memorized or Johnny's
      number memorized and I'd given Johnny a twenty five pound
      block, um, yesterday so Johnny had twenty five pounds and he was
      trying to sell it and, um, he was trying to get five fifty a pound for
      you, so, you know

Q.    So let's go back and talk about that. On, uh, Tuesday at about what
      time did you give John and who's Johnny again?
A.    Johnny Minix is Larry's good friend.

Q.    And you gave Johnny how much?
A.    Twenty five pounds.

led                              Page 37 of 48

Q.  Of marijuana?
A.  Yeah.

Q.  And what for?
A.  To sell it cause Johnny thought he could sell it.

Q.  Okay, what time of the day or so did you give it?
A.  I think I gave it him around noon time on, um, on, um, Tuesday.

Q.  On Tuesday. Where at?
A.  At his, um, business.

Q.  And where is that located at? Do you know an address or a street number or anything? No? Okay, what's the name of his business?
A.  Minix Glass.

Q.  Minix Glass, okay. Uh, you described it earlier as a, uh, off of State Road 84 north of State Road 84, uh, on southwest section of Fort Lauderdale. Is that correct?
A.  Yeah, that would be it.

Q.  Okay, so you delivered it there to his business?
A.  Yeah, I took it over there and gave it to him.

Q.  Did he, did he give you any money for it or is he just gonna sell it and owe you the money later?
A.  No, I just says take it and see what you can do with it.

STATEMENT OF: GREG PILLOCK                          C/N BS00-04-13368

Q.  Has he contacted you since he received it?
A.  Um, I called him up and asked him how he was doing with it and he
    said that the first person that looked at it rejected it but someone
    else, um, offered five fifty a pound for it. And, and, and then, um,
    but it never was finalized so Johnny, um, um, was still trying to sell
    it as, as, of today, at, um, maybe around three o'clock pm he was
    still trying to sell it.

Q.  Okay, and when you spoke to him about this were you, uh, in
    person at his business or on the phone or what?
A.  Oh, I, I went down to his business and, and seen him down there.

Q.  Did ya have anybody with you when you went down there?
A.  Yeah, I had my friend Mike with me.

Q.  And he was the one that was at the house the night
A.  Yeah.

Q.  That you loaded the stuff. What's Mike's last name?
A.  Cook.

Q.  Mike Cook, okay.
A.  He's an older gentleman.

Q.  Okay, so then, uh,
A.  Mike didn't have much of a part in it. He was just like a, kind of
    like a tag along friend.

Q.  Okay. So we've accounted for what sounds like all of, all of the
    marijuana at this point. Uh, when you decided you didn't want to

get caught with the marijuana that was still left in the van, oh, let me back up a second. Uh, at some point you drove, you had to move the marijuana from your van to the rental van?

A.    Uh huh.

Q.    When was that?
A.    I did that on, um, Tuesday.

Q.    About what time?
A.    Um, in the morning.

Q.    Where were you at when you did that?
A.    Right at home.

Q.    In front of your house?
A.    Uh huh.

Q.    Your apartment?
A.    Yup.

Q.    Okay, and then today, um, Wednesday, did you clean your van or do anything?
A.    Yeah, I cleaned it out.

Q.    What
A.    Swept it out.

Q.    What'd you do that for?
A.    Cause I'm, I know there was a little bit of stuff in there.

STATEMENT OF: GREG PILLOCK                          C/N BS00-04-13368

Q.  Little bit of?
A.  Yeah, just little pieces of, you know, crumbs and stuff.

Q.  Of mairjuana?
A.  Yeah, there was a few seeds that, nothing, nothing to speak of but
    just

Q.  What'd ya do with it?
A.  What'd I do with it?

Q.  Yeah, you cleaned it out, did ya throw it away or?
A.  I just swept it out on the ground and hosed it down the driveway. I
    think it was

Q.  Did you pick any of it up, put it in a bag or anything like that?
A.  Yeah, I picked some of it up and, and, and I saw a few buds, uh,
    little pieces and put it in a bag and, um, carried it down to the
    dumpster.

Q.  Okay, what color bag did you put it in?
A.  It was, uh, black, um, gray trash bag.

Q.  Trash bag. And you carried it to the dumpster and you put it in?
A.  Uh huh.

Q.  Okay, and then, uh, so after, after that was done you had received
    your phone call from, uh, the boat people, which would be Eric?
A.  I didn't receive it, my girlfriend did.

led                            Page 41 of 48

STATEMENT OF: GREG PILLOCK                              C/N BS00-04-13368

Q.    Your girlfriend did and she advised you that they had been arrested
      and wanted some bond money?
A.    Yeah.

Q.    You then became scared and, and what did you decide to do?  You
      wanted to get out of there?
A.    Yeah.

Q.    And save the load that you still had in the rental?
A.    Yeah, cause

Q.    So what'd you do then?  You got in the van and left?
A.    I, um, I went home and I grabbed my bags and I grabbed my, um,
      my attaché case here and, um, I, um, I got on the turnpike and, um,
      you know, I told my girlfriend that I was having problems and I, I
      had to go cause, um, the guys were in jail and, um, and, and it
      might be coming my way.

Q.    So you started heading north on the turnpike?
A.    Yeah.

Q.    Where were you going?
A.    I was gonna try to go north and go to my friend Vance's.

Q.    And where is that?
A.    Cause he's the only person I knew.

Q.    Where's that at?
A.    Um, up near Ocala.

STATEMENT OF: GREG PILLOCK                          C/N BS00-04-13368

Q.    Okay.
A.    But he didn't know what my intentions were.

Q.    You were just gonna go cause he was a friend of yours?
A.    I was just, I was just gonna go there and, um, ask him if I could, um, stay in his RV.

Q.    So at some point, uh, you get pulled over?
A.    Uh huh.

Q.    Uh, what happened?
A.    I got pulled over. I wasn't speeding or doing anything wrong but I saw two, um, state police cars in my rear view and, um, I was like oh boy and, um, I almost got off at the exit four, um, when I saw that but I didn't want to look suspicious getting off so I just stayed in the right hand lane and slowed down to sixty five. I, I was doing seventy. I think the speed limit is seventy. Um, I was just going with the normal flow of traffic and, and I got pulled over by the, um, state police.

Q.    They spoke to you about pulling you over? As to why they pulled you over?
A.    Um,

Q.    Or actually what did you say to them when you got out of the car?
A.    I didn't say anything. They, they, they approached from the passenger, um, side of the vehicle, in an uncanny way for a normal traffic spot, stop, and, um, asked me to exit the vehicle and, um, I

A.  (continued)
    asked the, um, officer if, um, he would like me to exit the vehicle
    out of the passenger side and, um, he appreciated that and, um, um,
    he asked me what was going on and um

Q.  What'd you say?
A.  I says well I, I guess you pulled me over. And, um, he asked me if I
    had any weapons and I think he asked me, maybe that was you that
    asked me if I had weapons. But anyways, um, that was it. There
    was a lot more cars that pulled up behind him and

Q.  Eventually I approached you, right?
A.  Right.

Q.  Okay, and I explained to you that you, we were interested in, in
    obtaining consent to search your van?
A.  Correct.

Q.  Right, and I explained to you that you didn't have to allow us to
    search the van?
A.  Correct.

Q.  And, uh, I filled out a, a consent to search form and you read it and
    understood it?
A.  Uh huh.

Q.  Right, you understood that you didn't have to allow us to search but
    you, you were wanting to cooperate at that point?

led                            Page 44 of 48

STATEMENT OF: GREG PILLOCK                        C/N BS00-04-13368

A.  Yeah, I looked it over and, um, you know, I, I think I understood
    what it said and I didn't read it real close but, um, I'm sure that, um,
    at that point I knew I was in a lot of, um, trouble, and, um, it didn't
    matter if I refused the search or not. It was just gonna be a, it
    would have just run the dogs or something.

Q.  But we didn't force you to, to allow us to search, right?
A.  No.

Q.  We didn't threaten you in any way?
A.  No.

Q.  Okay, you just freely and voluntarily said go ahead and search,
    search the van?
A.  Right.

Q.  Okay, and you signed the consent to search form?
A.  I believe, yeah, I signed it. I signed that piece of paper you asked
    me to sign.

Q.  Right, that's the one you read?
A.  Uh huh.

Q.  That talked about searching your van, right?
A.  Right.

Q.  Okay, and, uh, what was inside the van?
A.  Um, three hundred and thirty pounds of pot.

led                           Page 45 of 48

STATEMENT OF: GREG PILLOCK                                C/N BS00-04-13368

Q.    Okay, and then you expressed a desire to want to cooperate and that's what led us here to this point right now?

A.    Correct.

Q.    Okay. While we're still here for a little bit, uh, we have looked in your, in your, uh, attaché case and there's some photographs, uh, generally what are these photographs depict? Some of them here show a, a rest stop. Where is that rest stop located?

A.    Uh, that's the Seminole Truck Stop that, um, we were gonna use as a, um, a getaway plan if, um, if things didn't work out.

Q.    You were gonna land on a dirt roadway near this truck stop if for some reason the plane was being followed or something?

A.    Yeah, it could have been used for that. Um, and, um

Q.    An alternative landing strip maybe?

A.    Yeah, it was a possible, um, landing strip that was about twenty miles west of the airport.

Q.    Okay, there's another photograph here of, uh, two men sitting in a room. Who are they?

A.    That's Larry London and his brother Joe.

Q.    Larry London's on the right and he's wearing what? Can you describe what he's wearing?

A.    He's wearing a blue shirt and Levi's.

Q.    And his brother Joe is wearing a?

A.    Green shirt.

STATEMENT OF: GREG PILLOCK                                    C/N BS00-04-13368

Q.    Okay, we have some other, other photographs here also in your
      attaché case. What is this a picture of?
A.    Um, that's another place that Larry and I looked at, um

Q.    Where's that at?
A.    Up in, um, west of Boca airport. We looked at that and took some
      pictures of it but we didn't like it.

Q.    Why didn't ya like it?
A.    Um, it was fenced in and it wasn't on the, or near the traffic, um,
      pattern. So it wouldn't have worked.

Q.    Okay, here's more photos of that same spot?
A.    Correct. And these photos were taken about, maybe six weeks ago.

Q.    And these are taken from an airplane?
A.    Yeah, that Larry was flying.

Q.    That Larry was flying at the time. What kind of airplane was that?
A.    He had a, um, a (UNINTELLIGIBLE) Cessna that he came
      (YAWNING) cam down in. I think he, I think that's what he had.

Q.    Was it his plane or his company?
A.    No, it belonged to, um, somebody at the airport that, um, he, uh,
      paid them, um, three hundred and fifty dollars to, um, to, um, fly
      the, you know, to use the airplane.

Q.    Okay, do you remember the tail number on the plane that was
      rented for the, uh, to smuggle the marijuana in?
A.    Yeah, it was, um, N 805 TH.

led                               Page 47 of 48

STATEMENT OF:  GREG PILLOCK                          C/N BS00-04-13368

Q.  N 805, and what kind of plane was that?
A.  A Cessna Caravan.

Q.  Is there anything else about this that I haven't, uh, I haven't asked
    you that, uh, I might be missing or anything else you want to say?
A.  Um, just that I'd like to have a water or something.

Q.  We'll get you that right now as a matter of fact. All right, you
    haven't been abused in any way? We haven't, we haven't, uh,
    threatened you in any way or anything like that? You understand
    that your, this is all free and voluntary and we're all just trying to
    make this an easier time?
A.  Yeah, I just, um, hope that with my cooperation and being a
    hundred percent with ya that, um, I hope that I won't have to, uh, go
    to jail, you know, forever and ever. And I am afraid about, you
    know, repercussions from the Jamaicans and Larry and his friends
    and, um, I'm sure that a lot of people, um, that are gonna go down,
    um, would probably want to hurt me and my friend as far as, um,
    bodily harm and I, um, I'm afraid, I'm afraid for my life and for

TAPE TERMINATED – END OF SIDE TWO

led